The appellant was indicted for the first degree murder of Bobby Rufus Cooper by shooting him with a 30.30 rifle. He was convicted of first degree manslaughter and the jury fixed his punishment at five years in the state penitentiary. Appellant pleaded not guilty at arraignment in the presence of counsel and has at all times been represented by the counsel of his choice.
The facts in this case are not complicated. On December 9, 1979, Jimmy C. Acton, Chief of Police for the City of Millry, Alabama, received a telephone call from the deceased's sister-in-law, Mrs. Paul Cooper, around 4:00 p.m. Chief Acton drove to the Big Wheel Service Station on Highway 17 in Washington County, and Mrs. Cooper gave him directions to where the incident occurred. Chief Acton saw Mrs. Lillie Mae Williams standing near a fence approximately two hundred yards from the highway and spoke to her. Chief Acton next saw the appellant walking out of a nearby cornfield. The appellant had a rifle in his hands and a binocular case hanging on his shoulder. *Page 985 
Mrs. Williams had been in the company of Bobby Rufus Cooper, the deceased, and his eleven year old son Matthew. The three had driven behind the Big Wheel, which was owned by the deceased's brother, Paul Cooper, and had walked through the woods to "where we had seen some turkeys the day before." The deceased carried a rifle and Matthew carried a 410 shotgun. After walking towards a field separated by a fence, Mrs. Williams sat down. The deceased continued to walk along the fence and finally sat down along the middle of the fence line. There were bushes where the deceased was situated. After approximately thirty or forty minutes the deceased fired a shot and indicated to Mrs. Williams and Matthew he had shot a turkey.
Mrs. Williams testified that the deceased attempted to point out where the turkey was, but "we still couldn't see it." The deceased then "walked to the fence and told us to come on." Mrs. Williams stated that as she went over to pick up her thermos and jacket "the first shot was fired. So, all I remember is hitting the ground." Mrs. Williams saw the deceased "lying on the ground . . . There wasn't nothing to see. His face was turned the other way, just laying there." Mrs. Williams heard a second shot a couple of minutes later. She stated that, after the second shot, she and Matthew "decided we better go try to get help." Mrs. Williams heard a third shot a few minutes later as she and Matthew retraced their steps back to the Big Wheel.
Mrs. Williams left Matthew at the Big Wheel and went with Paul Cooper to the edge of the woods pointing out to Paul "where the turkeys were and about where I thought Bobby's body was." Mrs. Williams saw Chief Acton meet appellant coming out of the cornfield.
Matthew Cooper testified that, shortly after his father had shot the turkey and had walked over to him and Mrs. Williams, "we heard a shot. And then I told him we better hit the ground because somebody was shooting close to us." Matthew stated that his father was about five feet from him when he fell down. Matthew next observed his father "just laying there . . . I was calling him and he wouldn't answer me." Matthew heard two more shots before he and Mrs. Williams made it back to the Big Wheel.
Chief Acton testified that, when he first saw appellant coming out of the woods, he asked appellant who he was. Acton stated that appellant was not a suspect and was not in custody at that time. Acton next asked appellant if he heard any shots being fired and appellant responded, "Yes, I fired two shots in the air." Before relating any other statements made by appellant, Chief Acton was taken on voir dire outside the presence of the jury.
Acton, on voir dire, stated that the report he received over the telephone was that a person had either been shot or was hurt. "They told me over the phone they didn't exactly know what had happened." Acton stated that he responded to the call to try "to find out what happened." When Acton saw Mrs. Williams she was unsure whether the deceased had been shot. "She said Bobby was laying there and never would answer . . . [S]he heard some shots." At the time Acton first saw appellant "I wanted to know who he was. . . . I hadn't gotten to the scene yet, I didn't know what had happened." Acton stated he was "trying to determine if somebody had been hurt or what. . . . . Maybe somebody fell and hurt their self. I didn't know. . . ." Acton stated that, when he asked appellant if he had heard any shots being fired, "I didn't know anybody was shot. At that time I didn't suspect or didn't know anything. I was trying to find out if there had been a crime committed, or if there had been an accident that happened."
At the conclusion of this voir dire the trial court overruled defense counsel's objection to Chief Acton's testimony relating appellant's statement. "I will allow you to ask him questions about what was said. I don't think at this time there was a suspect."
Chief Acton next testified before the jury that, after appellant admitted he had fired two shots in the air, Mrs. Williams "spoke *Page 986 
and said you're the one that shot Bobby." Defense counsel outside the jury's presence, argued that, when Mrs. Williams accused appellant of shooting the deceased, appellant became a suspect, the investigation had focused upon him and he was entitled to the Miranda warnings. The objection was overruled.
Back in the presence of the jury Chief Acton testified that, after Mrs. Williams had accused appellant of shooting the deceased, appellant responded, "I didn't shoot nobody, if I had, I wouldn't have missed." Appellant then made the statement, "I'm tired of people hunting on my land." Appellant told Chief Acton he had "chased" some people back to the Big Wheel and that one of them wore a blue denim jacket.
Chief Acton then told appellant, "you own this land, let's go ahead and check it out and find out exactly what did happen. . . . At that time we left and went over into the area of the direction Mrs. Williams give me where . . . the incident took place." Acton testified that, as he walked with Mrs. Williams and appellant, he saw Paul Cooper's truck. "As I got down just a little ways, I was still unsure, you know, where the subject was or anything. And I hollered, I said, Paul is everything okay?" Acton stated that, when he found out what had happened he immediately turned to appellant, took away his gun and placed him in custody. Acton escorted appellant to Officer W. A. Taylor's car and "sat him in the back seat of the patrol car." Acton testified that he then read appellant his Miranda
rights while Officer Taylor was standing beside the car. Appellant informed Acton that "he didn't want to talk" and made no further statement to Acton after he was advised of his rights. Acton transferred custody of appellant to Officer Taylor. Chief Acton concluded his direct examination by identifying several State's exhibits, including photographs of the deceased at the scene.
On cross-examination Chief Acton testified that, when Paul Cooper told him his brother was dead, he (Acton) determined that an incident had occurred and called for assistance over the radio. "It was questionable whether it was a homicide or accidental."
Officer W.A. Taylor testified that, when he arrived at the Big Wheel, Chief Acton placed appellant in his patrol car. "[H]e told me to sit there with him and don't let him out or don't let nobody get into the car." Officer Taylor testified that appellant made a statement to him while he was in his custody in the patrol car. Appellant's statement was made in response to questioning by Officer Taylor. It is this statement that is the crux of this appeal and which mandates a reversal of appellant's conviction.
From the record it does not appear that Officer Taylor actually heard Chief Acton advise appellant of his constitutional rights under Miranda. It is clear that Taylor did not read appellant his Miranda rights.
Chief Acton was recalled by the State to establish whatMiranda warnings he had actually given appellant when he placed appellant in Officer Taylor's patrol car. In concluding his testimony Chief Acton testified:
 "Then I asked him further do you understand each of these rights I have explained to you. He said, yes. I said with these rights in mind do you wish to talk to me now. He (sic) answer was, no, I'd rather talk to my family and to my lawyer.
 "At that time I turned him over to Officer Taylor." (Emphasis added.)
Officer Taylor was then recalled and attempted to establish a voluntariness predicate for appellant's statement. Then over repeated and persistent objections by defense counsel Taylor testified that he asked appellant, "[W]hat in the world was going on." Appellant responded to this question, "It's a dead man down there." Officer Taylor continued to question appellant. In pertinent part we find in the record:
 "I asked him did he get killed, die or what. He says I shot him. . . .
. . . . *Page 987 
 ". . . Then I says I'm not questioning you — I hope I'm not questioning you too much but he must of made you mighty mad to shoot him. Then he said I'm tired of folks hunting on my land. I says I didn't know you owned any land over here. Do you own this land. He said, well, yes and no. And that kind of shook me up. I didn't ask him too many more questions until somebody else come by and told me exactly who it was shot. He didn't tell me who it was shot.
. . . .
 "Well, that's the most that he told me because I kind of hushed up. . . ."
Upon consideration of these facts in light of the Supreme Court of the United States' decision in Edwards v. Arizona,450 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), we are required to reverse appellant's conviction. The law is plain:
 "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." 101 S.Ct., at 1884.
Further recitation from Edwards, supra, is unnecessary. Appellant in no way made a waiver after he had specifically invoked his right to counsel.
The judgment of the lower court is hereby reversed and this cause is remanded.
REVERSED AND REMANDED.
All the Judges concur.