The defendant was indicted for capital murder under Alabama Code Section 13A-5-31 (a)(2) (Supp. 1977) for the robbery and intentional killing of Ms. Gail Nix. After a jury trial, she was convicted of murder in the first degree and sentenced to life imprisonment in accordance with the verdict of the jury. The facts surrounding the murder are reported in Moulds v.State, 426 So.2d 942 (Ala.Cr.App. 1982), a companion case involving the defendant's husband.
The only issue raised on this appeal is whether the defendant's post-arrest confession, obtained after she had invoked her right to counsel, should have been suppressed on the authority of Edwards v. Arizona, 451 U.S. 477,101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and Rhode Island v. Innis,446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).
Testimony presented during the motion to suppress established that the defendant was arrested, along with her husband and one Charles Vanderford, on Saturday morning, August 23, 1980. The defendant was given her Miranda[1] rights, separated from her husband and Vanderford, and transported to the Jefferson County Sheriff's Office in Fairfield. There, she was placed in an office and readvised of her rights at 11 a.m. Vanderford and the defendant's husband were taken to different rooms and the defendant had no access to them.
Detective Sergeant James Earl Smith testified that when he went in to question the defendant, she stated that she wanted to talk to an attorney, Mr. Fred Erben. The defendant tried to contact Erben at his office but was unable to reach him. Sergeant Smith suggested that, since it was Saturday, the defendant try to call the lawyer at home. When the defendant failed to reach her attorney there, Smith recommended *Page 1177 
she try Erben's law partners, Mr. Al Bowen and Mr. Jim Fullan. The defendant was left alone in the office with access to a telephone and a directory, but she was unsuccessful in contacting her attorney or any of his law partners.
Sergeant Smith testified that after the defendant finished her calls he talked with her a few minutes and said, "I know what Fred and them will tell you to do, they will tell you not to make a statement." According to Smith, the defendant responded that she "wanted to go ahead and talk anyway."
The defendant was advised of her Miranda rights and requested an attorney at approximately 11:30 a.m. Homewood police Sergeant Edward A. McKinzie stated that, once the defendant asked for an attorney, he did not question her about the murder charge, but merely "talked with her off and on . . . just talked in general about different things * * * nothing pertaining to the charges against her though." Sergeant McKinzie then left the room but he was later called back by Sergeant Fred House, who informed him that the defendant "wanted to talk", and wished to make a statement. At 2:58 p.m. the defendant told Sergeant McKinzie she was "ready to make a statement."
McKinzie readvised the defendant of her rights and obtained her signature on a rights waiver form. He then turned on his tape recorder and the defendant began a lengthy narrative in response to his question, "Yes, ma'am, start from the very beginning and tell us in your own words." The crux of the defendant's statement was that she had been forced by her husband to take part in the crime of which she was accused, and that she had complied with his orders only because of her fear that she would be killed if she refused. The statement also included the following exchange:
 "QUESTION: This morning when you were picked up by the officers, they advised that you were being charged with the murder of Gail Nix. Did you have an opportunity to call or try to get a hold of your attorney?
"ANSWER: Yes, sir.
 "QUESTION: Have you made several attempts to contact an attorney by phone?
 "ANSWER: Yes, sir. He was out of town.
 "QUESTION: Have you been given every opportunity to contact any attorney you wish?
"ANSWER: Yes, sir.
 "QUESTION: Did you tell me of your own free will that you wanted to withdraw your request to have an attorney present and to give a statement as to your knowledge about Gail Nix?
 "ANSWER: Yes, sir. I feel like it would be in my best interest for me and my children because I was made to do something I didn't want to do, made by force.
 "QUESTION: But you made your decision of your own free will to give this statement without your attorney; is that correct?
"ANSWER: Yes, sir."
The defendant took the stand and testified that after she arrived at the sheriff's office she heard conversations in the hall to the effect that "they had the ones that had killed Gail Nix and they were going to really sock it to us and give us the electric chair." She said that, after her unsuccessful attempts to reach an attorney, police officers kept coming into the room inquiring whether she wanted to make a statement and telling her that she "should" give a statement.
The defendant testified that about 3 p.m. Sergeant William A. West told her she "had better give a statement to save (her) self" because Charles Vanderford, "the juvenile was spilling his guts out and . . . all (of them were) going to go to the electric chair." The defendant stated that the earlier conversations she had heard, coupled with Sergeant West's comment, scared her so much that she told someone she would talk.
In rebuttal, Sergeant West denied that he told the defendant to give a statement to "save herself" or that "the juvenile was spilling his guts." The trial court ruled the statement admissible, finding that the defendant, *Page 1178 
having once invoked her right to have an attorney present, had subsequently waived the right before giving her statement.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), the Supreme Court of the United States established certain procedural safeguards to protect the exercise of the Fifth Amendment privilege of self-incrimination from the coercive effects of custodial interrogation. InEdwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 378 (1981), that court imposed two additional protections available to suspects who exercise their Fifth Amendment right to have counsel present during custodial interrogation.
 "(W)hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1884-85.
The evidence in this case, although conflicting on this issue, was sufficient to support a determination by the trial court that the defendant was not interrogated until after she had waived her earlier-invoked right to counsel. The defendant was subjected to neither "express questioning" nor to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301,100 S.Ct. at 1689-90. See also Collier v. State, 413 So.2d 396
(Ala.Cr.App.), affirmed, 413 So.2d 403 (Ala. 1981).
The words and actions of Sergeant Smith tended, if anything, to discourage any statement by the defendant. Sergeant Smith made several suggestions aimed at helping the defendant reach an attorney and he even told her that her attorney, if present, would most likely advise her not to talk with the police.
In addition, Sergeant McKinzie stated that he did not question the defendant after she requested an attorney, but only engaged her in general conversation unrelated to the charge against her.
After the defendant requested counsel, the police only engaged her in "permissible custodial communications." Justice Powell recognized the distinction between custodial communications and custodial interrogation in his concurring opinion in Edwards:
 "Communications between police and a suspect in custody are commonplace. It is useful to contrast the circumstances of this case with typical, and permissible, custodial communications between police and a suspect who has asked for counsel. For example, police do not impermissibly `initiate' renewed interrogation by engaging in routine conversations with suspects about unrelated matters. And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney. E.g., State v. Turner, 32 Or. App. 61, 65, 573 P.2d 326, 327 (1978); see State v. Crisler, 285 N.W.2d 679, 682 (Minn. 1979); State v. Marcum, 24 Wn. App. 441, 445-446, 601 P.2d 975, 978 (1979). It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk. Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision. As JUSTICE WHITE has observed, this Court consistently has `rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case.' Michigan v. Mosley, 423 U.S. 96, 109
[96 S.Ct. 321, 329, *Page 1179 46 L.Ed.2d 313] (1975) (WHITE, J., concurring in result)."
451 U.S. at 490, 101 S.Ct. at 1888.
The defendant's assertion that she was ready to make a statement, even if made in response to an officer's inquiry of whether she had "changed her mind about speaking to them without an attorney", constitutes a communication initiated by the accused under Edwards.
Thus, the trial court had before it evidence from which it could conclude that the defendant was not "interrogated" after she requested counsel and before she waived that right. CompareWarrick v. State, 409 So.2d 984 (Ala.Cr.App. 1982), in which this Court held that a murder suspect, who stated he would prefer to talk with counsel before being questioned, was "interrogated" by an officer who inquired, "(W)hat in the world was going on? . . . (D)id (the victim) get killed, die or what."
The facts of this case clearly support a finding that the defendant waived her earlier-invoked right to an attorney. As the Supreme Court stated in Edwards:
 "(W)waivers of counsel must not only be voluntary, but constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case `upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.'"
 451 U.S. at 482, 101 S.Ct. at 1887 (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).
Our independent review of the record convinces us that the defendant knowingly and intelligently waived her right to counsel. In the absence of any improper interrogation, she indicated that she was ready to make a statement, signed a written waiver, and orally stated that she wanted to withdraw her request to have an attorney present because she felt it would be in the best interest of her and her children. The defendant made an "informed and intelligent assessment of her interests." Edwards, 451 U.S. 477, 491 n. 1; 101 S.Ct. 1880,1888 n. 1, 68 L.Ed.2d 378 (Powell, J., concurring) (quotingMichigan v. Mosley, 423 U.S. 96, 109, 96 S.Ct. 321, 329,46 L.Ed.2d 313 n. 1 (1975) (White, J., concurring)). The record justifies the finding that the defendant voluntarily, knowingly and intelligently relinquished her right to consult an attorney before she made a statement.
The judgment of the trial court is due to be affirmed.
AFFIRMED.
All Judges concur.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).