Timothy Dale **BUNCH,** Petitioner–
**Appellant,**

v.

Charles **THOMPSON,** Warden,
**Respondent–Appellee.**
(Two Cases)

Nos. 90–4001, 90–4005.

United States Court of Appeals,
Fourth Circuit.

Argued April 11, 1991.

Decided Nov. 27, 1991.

See also 225 Va. 423, 304 S.E.2d 271.

Amy Berman Jackson, Karl Anthony Racine, Venable, Baetjer, Howard & Civiletti, Washington, D.C., argued (Gerard F. Treanor, Jr., on brief), for petitioner-appellant.

John H. McLees, Jr., Asst. Atty. Gen., Richmond, Va., argued (Mary Sue Terry, Atty. Gen. of Virginia, on brief), for respondent-appellee.

Before WIDENER, SPROUSE, and WILKINSON, Circuit Judges.

## OPINION

WILKINSON, Circuit Judge:

Timothy Bunch was convicted by jury trial and sentenced to death for murder in the commission of robbery while armed with a deadly weapon in violation of Va. Code Ann. § 18.2–31(d) (1988). His conviction and sentence were affirmed by the Supreme Court of Virginia on direct appeal. The Virginia courts have considered and dismissed Bunch's state petition of habeas corpus. Bunch is now before this court appealing the district court's dismissal of his federal habeas petition. He alleges nu-

merous points of constitutional error but argues primarily that his confession was admitted in violation of his rights under the Fifth Amendment and that he was denied effective assistance of counsel in violation of the Sixth Amendment. Finding no merit in Bunch's claims, we affirm the judgment of the district court.

## I.

On January 31, 1982, Bunch killed his girlfriend Su Cha Thomas. The couple was at Thomas' house, preparing to go out for dinner when Bunch hid in a downstairs bathroom to lure her. After shooting Thomas in the head, Bunch went upstairs and spent an hour or so drinking wine and listening to the stereo. He then ransacked the house, taking Thomas' Rolex watch, a diamond ring, a string of pearls and a gold chain. Before he left, he tied a knot in the scarf Thomas was wearing, pulled her unconscious body to a door and hung her by the scarf from the doorknob. According to the medical examiner there was a combined cause of death—"a gunshot wound to the head ... with a secondary complication, asphyxiation by hanging."

Following the murder, Bunch pawned Thomas' watch. A report that the pawn shop filed with the police set off an investigation of Bunch, who was a sergeant in the United States Marine Corps. Bunch had met Thomas while temporarily stationed at Quantico in Virginia, but had since returned to his permanent station in Japan.

Two Virginia officials—police inspector Donald Cahill and an assistant Commonwealth's attorney—traveled to Japan to question Bunch. They informed Bunch of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), after which Bunch signed a consent form and agreed to talk with them. Bunch asserts that he asked for counsel "approximately a dozen times" during the interrogation, while the Virginia officials claim that Bunch never clearly requested counsel but only mentioned once that "he felt like he might want to talk to a lawyer." At that point, the Commonwealth's attorney left the room, but Cahill stayed and dis-cussed another matter with Bunch for several minutes. As Cahill got up to leave, Bunch told Cahill he would cooperate and informed him that the gun was at his mother's house in Indiana and that Thomas' ring was in Japan. Cahill and the Commonwealth's attorney decided that interrogation should not continue unless Bunch signed another consent form. When Bunch refused to sign the form, the interview ended.

Bunch, still in military custody, was transported from Japan back to Quantico, which took forty-two hours. Although military personnel did not question Bunch, they informed him during the flight of his *Miranda* rights again. Upon arrival at Quantico, Bunch proceeded through processing for delivery to state authorities. During processing, Bunch met with Major Donald Jillisky, an attorney with the Marine Judge Advocate General's Office. Jillisky informed Bunch that he was not present as Bunch's attorney, but only to advise him of his situation and to transfer him to state authorities. The military attorney told Bunch of the charges he was facing and that he would either have to obtain an attorney or have one appointed for him. Jillisky also instructed Bunch that "he did not have to say anything until he consulted with his lawyer, and that it was probably not in his best interest to say anything until he consulted with his lawyer."

Following completion of the military processing, Bunch was turned over to Investigator Cahill for transportation to the state police station. During the drive, Cahill asked Bunch "if he felt he was ready to sit down and go over the case." Cahill informed Bunch that he was under no obligation to speak with Cahill and that the decision was for Bunch to make. Bunch told Cahill he had spoken with an attorney at Quantico who had advised him to contact his own lawyer before making any statements, but had decided to "get it off his chest" and tell the whole story.

When they arrived at the station, Bunch was once again advised of his *Miranda* rights. He signed a consent form and con-

fessed to Cahill. In his confession, Bunch stated that he had decided a few days before killing Thomas to kill someone, probably a prostitute. He decided on Thomas because "she was a slut and she reminded him too much of his wife and he wanted her money." He told Cahill that he shot Thomas in the head from behind and had a sexual orgasm when doing so. After ransacking the house, he dragged Thomas to the doorknob and hung her by her scarf, again becoming sexually aroused. He gathered her jewelry and left the house.

Bunch was tried for murder during the commission of armed robbery. The trial court suppressed the incriminating statements that Bunch had made in Japan, concluding they had been obtained in violation of his right to counsel. The court held admissible the confession Bunch gave to Cahill in Virginia, however ruling that he had "intelligently, wittingly, freely and voluntarily" waived his rights. A jury convicted Bunch of capital murder and sentenced him to death based on the "vileness" of the crime. *See* Va.Code Ann. § 19.2–264.2 (1990). The conviction and sentence were affirmed on direct appeal. *See Bunch v. Commonwealth*, 225 Va. 423, 304 S.E.2d 271 (1983).

Bunch filed a state petition for habeas corpus in February 1984. The trial court dismissed all the asserted points of error except for the claim of ineffective assistance of counsel. On that point the court conducted a plenary hearing, after which the court dismissed the claim in May 1985. The Virginia Court of Appeals dismissed Bunch's appeal for lack of jurisdiction and the Virginia Supreme Court denied Bunch's petition in February 1988. Bunch then filed a federal habeas corpus petition which the district court dismissed in March 1990.

This appeal followed. In his habeas petition, Bunch raises numerous claims of constitutional error. We shall address his two major claims—that his confession was improperly admitted and that he was denied effective assistance of counsel—in the first two sections. We then will discuss the remaining allegations.

## II.

Bunch's first argument is that admission of his confession violated both his right to counsel and his right to remain silent. We shall address each claim in turn.

## A.

■ The Virginia Supreme Court ruled on direct appeal that admission of Bunch's confession did not violate his right to counsel. On collateral review, our examination of the Virginia Supreme Court's ruling is guided by the "new rule" doctrine announced in such cases as *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990). In *Teague,* the Supreme Court held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced" and decided that "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301, 310, 109 S.Ct. at 1070, 1074 (emphasis in original). Thus, if the question on which the Virginia Supreme Court ruled was "susceptible to debate among reasonable minds" at the time, then a reversal on collateral review would be an application of a new rule in violation of *Teague.* *Butler,* 110 S.Ct. at 1217–18. "State courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands." *Engle v. Isaac,* 456 U.S. 107, 128 n. 33, 102 S.Ct. 1558, 1572 n. 33, 71 L.Ed.2d 783 (1982).

■ Bunch seeks to avoid application of the new rule doctrine by arguing that the law in existence in June 1983 when the Virginia Supreme Court affirmed his conviction dictated that his confession be suppressed. He bases his argument on *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and claims that case clearly established a per se rule that an accused in custody who has invoked his right to counsel cannot waive that right

unless he himself initiates further conversation with the police. Bunch maintains that he never initiated any further exchanges with the police after he invoked his right to counsel and that under the clear rule of *Edwards* his confession should have been suppressed. According to Bunch, the Virginia Supreme Court should never have reached the issue of whether he intelligently and knowingly waived his rights because that issue arises only when the suspect initiates conversation.

Our examination of the law at the time of the Virginia Supreme Court decision, however, convinces us that the admissibility of the confession was "susceptible to debate among reasonable minds." The Virginia Supreme Court ruled the confession admissible both because Bunch "intelligently, wittingly, freely and voluntarily" waived his right to counsel and because Investigator Cahill's inquiry did not amount to police-initiated interrogation under *Edwards*. *Bunch*, 304 S.E.2d at 277. At that time, *Edwards* did not dictate a contrary conclusion.

It seems clear today that *Edwards* established a bright-line rule that before a suspect can waive his invoked right to counsel he must be the party to initiate subsequent communication. *See Solem v. Stumes*, 465 U.S. 638, 646–47, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984). That holding was not universally clear to state courts struggling with *Edwards* when the opinion was first issued, however. *See, e.g., Richardson v. State*, 274 Ark. 473, 625 S.W.2d 504 (1981); *Leuschner v. State*, 49 Md.App. 490, 433 A.2d 1195 (1981). Even had that point been perfectly obvious, *Edwards* left numerous other issues unresolved—most notably, what acts constituted initiation and interrogation. The *Edwards* opinion nevertheless recognized that such matters were germane to any right to counsel analysis. "The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver." 451 U.S. at 485–86, 101 S.Ct. at 1885. Justice Powell, concurring in the result in *Edwards*, was the only one to address directly the meaning of "initiation" and "interrogation" in this context:

> [P]olice do not impermissibly 'initiate' renewed interrogation by engaging in routine conversations with suspects about unrelated matters. And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney. It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk. Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision.

451 U.S. at 490, 101 S.Ct. at 1887 (citations omitted). Still, the Supreme Court could not agree on what constituted initiation in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), a case decided shortly after Bunch's conviction became final. That the Virginia Supreme Court reasonably applied *Edwards* can readily be seen through an examination of contemporaneous courts' interpretations of that case and of the concepts of initiation and interrogation.

In *Moulds v. State*, for example, the Alabama Court of Criminal Appeals considered an accused who had unequivocally invoked her right to counsel but who had been unable to contact her attorney. 429 So.2d 1176 (Ala.Crim.App.1983). A police sergeant spoke with the accused for a few minutes and then told her that her attorney would tell her not to make a statement. The accused responded that she "wanted to go ahead and talk anyway." The court concluded that "[t]he defendant's assertion that she was ready to make a statement, even if made in response to an officer's inquiry of whether she had 'changed her mind about speaking to them without an attorney,' constitutes a communication initiated by the accused under *Edwards*." *Id.* at 1179. *See McCall v. State*, 501 So.2d

496, 500 (Ala.Crim.App.1986). The court also specifically rejected the argument that the sergeant's actions constituted interrogation under *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980):

> The defendant was subjected to neither "express questioning" nor to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

429 So.2d at 1178 (citing *Innis* ).

The Supreme Court of Connecticut reached a similar conclusion in *State v. Acquin*, 187 Conn. 647, 448 A.2d 163 (1982). There the suspect had clearly requested counsel but rejected all suggestions for obtaining one. In response to further police questioning the suspect revealed that "it wasn't really an attorney that he wanted, it was just somebody he could trust." *Id.* 448 A.2d at 170. After police brought in the accused's requested psychiatrist, he confessed. Citing Justice Powell's concurrence in *Edwards* that "police legitimately may inquire whether a suspect has changed his mind," the court found no violation of the suspect's right to counsel. "Unquestionably, the defendant invoked his right to counsel.... however, subsequent legitimate questions to find out whom he wanted showed that the request was not as unequivocal as it appears to be on its face." *Id.* 448 A.2d at 176. The Supreme Court of Connecticut also dismissed the idea that the questions directed at clarifying the defendant's request for counsel constituted interrogation under *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "They were not of the kind likely to elicit an incriminating response." 448 A.2d at 175.

In *State v. Scott*, 626 S.W.2d 25 (Tenn. Crim.App.1981), the defendant invoked his right to counsel whereupon the police stopped interrogation. While being escorted back to the holding cell, however, the suspect spoke with his girlfriend who loudly urged him to "tell the truth." The officer escorting the suspect then asked the defendant whether he wanted to talk about the case or continue to the holding cell. The suspect confessed. The court refused to suppress the statement, concluding that "[t]hese facts cannot be equated with a resumption of the interrogation as condemned by *Edwards.*" *Id.* at 29. *See also Johnson v. State*, 251 Ga. 62, 303 S.E.2d 7, 8 (1983) ("Police may legitimately inquire whether a suspect has changed his mind about speaking to them with or without an attorney.").

■ The Virginia Supreme Court decision is similar to those of other states interpreting the meaning of initiation and interrogation in the immediate aftermath of *Edwards*. The Virginia court concluded that Cahill's asking Bunch "if he felt he was ready to sit down and go over the case" was a legitimate attempt to determine whether Bunch's decision not to speak with the police without an attorney present had changed. 304 S.E.2d at 277. Cahill testified at the suppression hearing that he asked the question because he knew that Bunch had just spoken with a lawyer. As in the *Moulds* case, Cahill informed Bunch that he "certainly was not required to talk to [Cahill] if he didn't want to." This communication from Cahill was a far cry from the communication in *Edwards*, where the accused was informed that "he had to talk" to the police. The Virginia Supreme Court thus determined that Cahill's inquiry "amounted to nothing more than an effort to ascertain if Bunch had changed his mind about wanting an attorney and, hence, did not amount to police-initiated interrogation within the meaning of *Edwards*." 304 S.E.2d at 277. The court's opinion that Cahill's question was not police-initiated interrogation under *Edwards* was perfectly consistent with other case law at the time and must be considered a reasonable application of that case.

Bunch nevertheless argues that he did not make a knowing and intelligent waiver. This claim has been waived because Bunch did not raise it on state habeas or even to the federal district court. *See Harrison v. Warden, Maryland Penitentiary*, 890 F.2d 676 (4th Cir.1989); *Whitley v. Bair*, 802

F.2d 1487 (4th Cir.1986). The claim is also meritless. Bunch had been informed of his rights numerous times, he had received legal advice to remain silent, he had been informed that he was not required to speak with Cahill, and he had understood that his confession could result in the death penalty. As the Virginia Supreme Court stated, this was a case of an individual

> who, despite repeated warnings of his rights and contrary to sound advice "not to say anything," decided "he was ready to tell the whole story" and "wanted to get it off his chest." Moments before confessing, he stated in writing that he did not want a lawyer and that he was willing to answer questions. We can conceive of no clearer case of a " 'knowing and intelligent relinquishment or abandonment' " of [*Miranda* ] rights.

304 S.E.2d at 277 (citing *Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982)).

We therefore dismiss Bunch's claim on collateral attack on the basis of *Teague v. Lane* and its progeny. Those cases require that the Virginia Supreme Court ruling be judged against the backdrop of other case law at the time of its decision on direct appeal, not against the law that may have evolved during the time that Bunch's case made its various rounds on collateral review. To grant the writ would hold the Virginia Supreme Court's application of *Edwards* in 1983 to be beyond the pale of "reasonable, good-faith interpretation[ ] of existing precedents." *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990) (quoting *Butler* ). This we decline to do. The Virginia court was ruling on a close question of law at the margins of the *Miranda* doctrine, namely, under what circumstances any subsequent conversations between a suspect and officials could be considered a reinitiation of interrogation by the state. The Virginia Supreme Court's ruling on that point warrants respect from a federal habeas court as one that reasonable jurists could make. *See Butler,* 110 S.Ct. at 1217–18.[1]

**B.**

■ Bunch also argues that his confession should have been suppressed because he asserted his right to remain silent in Japan and Virginia investigators did not "scrupulously honor" that right as required by *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). When Bunch raised this claim in his state habeas petition, the Commonwealth, in its "Motion to Dismiss," responded that the claim had been procedurally defaulted because it had not been raised either at trial or on direct appeal. *See Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974). The Commonwealth made no other arguments opposing the claim. The circuit court dismissed the claim "for the reasons stated in the Motion to Dismiss." Thus, the circuit court clearly dismissed the claim on the grounds of the state procedural default. *See Coleman v. Thompson,* —— U.S. ——, 111 S.Ct. 2546, 2559–61, 115 L.Ed.2d 640 (1991) (grant of a motion to dismiss on state procedural grounds neither rests on nor is interwoven with federal law). The Supreme Court of Virginia refused the petition for appeal "[u]pon review of the record in this case

---

1. The dissenting opinion quite fails to appreciate the fact that the rule announced in *Edwards* did not define all the terms by which the rule would be implemented. The *Edwards* holding rested upon the concepts of initiation and interrogation, the precise boundaries of which the state courts could legitimately determine were undefined. Unlike the dissent, we decline to hold in hindsight that the substantial number of state courts struggling with these concepts were in any way intent upon disregarding higher authority. We have no indication, for example, that Virginia was attempting to do anything other than conscientiously apply the *Miranda* doctrine. Indeed, state and military authorities gave Bunch his *Miranda* warnings on no less than three separate occasions and the state courts in fact threw out his confession in Japan as violative of his right to counsel.

In that same regard, we wish to make plain that federal intermediate courts refusing to apply new rules to reverse state convictions on collateral attack are not criticizing any lack of clarity in earlier Supreme Court decisions, but are only acknowledging what *Teague* and its progeny now require us to acknowledge—that even the clearest decisions will leave some questions for the state courts in good faith to resolve.

and consideration of the argument submitted in support of and in opposition to the granting of an appeal." This order of the Virginia Supreme Court provides no evidence that that court considered the claim on the merits. Where "the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Ylst v. Nunnemaker,* —— U.S. ——, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991). In such circumstances, the procedural default must be considered an adequate and independent state ground that forecloses review of the claim in federal court. *Coleman,* 111 S.Ct. at 2557–61.[2]

### III.

Bunch next argues that he was denied the right to effective assistance of counsel in violation of the Sixth Amendment. His primary point is that trial counsel was ineffective in preparing and presenting mitigating evidence at the sentencing phase of the trial. He additionally raises other allegations of deficient performance that the government urges are procedurally barred. We shall address these arguments in turn.

### A.

The standard of review for ineffective assistance of counsel claims is a familiar one. Under *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), in order to establish a violation of his Sixth Amendment rights, Bunch must show that his counsel's performance was deficient and that the deficiency so prejudiced his defense as to deprive him of a fair trial. This is no insubstantial burden, as "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied

on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064.

Bunch asserts that his court-appointed attorneys performed inadequately by failing to investigate and present potentially mitigating factors at the sentencing phase. Bunch presented to the state habeas court numerous affidavits containing mitigating evidence that he asserts was easily available during the trial. Those affidavits came from various family members and friends, a few neighbors, a law student who interviewed military officers who had some contact with Bunch, and Bunch's state habeas attorney who had interviewed Bunch's ex-wife. Bunch argues that his counsel should have offered the jury more mitigating evidence than simply his mother's testimony. *See Coles v. Peyton,* 389 F.2d 224, 226 (4th Cir.1968).

We are unpersuaded. It is becoming all too commonplace to charge even diligent counsel in the midst of difficult circumstances with the adverse outcome in a capital case. When examining ineffective assistance claims, however, we must appreciate the practical limitations and tactical decisions that trial counsel faced. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Particularly when evaluating decisions not to investigate further, we must regard counsel's choices with an eye for "reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. at 2066.

Our review of the record reveals that Bunch's attorneys made reasonable determinations in deciding how best to present mitigating factors. For example, counsel did not have the psychiatrist who

---

**2.** Relying on Justice O'Connor's concurring opinion in *Duckworth v. Eagan,* 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989), the Commonwealth argues that federal courts should not apply on collateral review the exclusionary rule for *Miranda* violations. *See Stone v. Pow-*

*ell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (federal habeas courts reviewing state criminal convictions will not apply the exclusionary rule for Fourth Amendment violations). Because we rest this decision on narrower grounds, we need not address this question.

evaluated Bunch for potential mitigating evidence testify before the sentencing jury. Bunch contends that the psychiatrist could have informed the jury of Bunch's stressful childhood, which included domestic violence, and of his loss of self-esteem following the dissolution of his marriage. In addition, the doctor could have testified that Bunch's lack of a prior criminal record indicated some ability to control his behavior, that he was under extreme pressure at the time of the murder, and that he had the capacity for rehabilitation.

Counsel was aware of this beneficial testimony but was also cognizant of the risks involved if the psychiatrist had taken the stand. State psychiatrists had evaluated Bunch and made damaging findings of which the prosecution was aware. Had Bunch's attorneys called their psychiatrist, harmful evidence would have emerged on crossexamination. Counsel feared that the overall impact of the psychiatric testimony would be to reinforce all the negative aspects of Bunch's self-destructive behavior. Bunch's lawyers were additionally worried by "some unusual sexual orientation aspects of the case that we in no way wanted the jury to hear about." Having interviewed the state psychiatrists in addition to their own witness, counsel made a reasoned strategic choice not to offer psychiatric testimony. To use that decision as a basis for finding ineffective assistance would be to institute a rule that psychiatric testimony should always be offered in the sentencing phase, no matter how counterproductive or damaging. This we refuse to do. Trial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case. The failure to put on such evidence, or the presentation of evidence which then backfires, may equally expose counsel to collateral charges of ineffectiveness. The best course for a federal habeas court is to credit plausible strategic judgments in the trial of a state case.

▉ This view governs our disposition of the remaining mitigation claims. With respect to possible military mitigating witnesses, counsel spoke with the commanding officer of the correctional facility where Bunch had last been stationed as well as with the first sergeant of that facility. The commanding officer reported that Bunch had unsatisfactory working relationships with his peers, had been dismissed from his position for drug related problems and would not have been recommended for re-enlistment. The first sergeant had taken his post after Bunch had been arrested but was familiar with his reputation and was unable to offer any positive information. Additionally, counsel contacted the military liaison officer for Bunch's case and obtained copies of Bunch's military record to provide the evaluating psychiatrist. With finite hours and other demands in the case, counsel chose not to spend valuable time pursuing what appeared to be an unfruitful line of investigation. This too was a reasonable decision.

▉ Counsel contacted and interviewed Bunch's parents. Although initially hopeful about presenting Bunch's father as a favorable witness, counsel was concerned about both his reliability and the possibility of contradictory testimony. For example, Bunch's father did not show up for an important meeting with counsel because he had gotten drunk the night before. Also, much of the mitigation strategy was to highlight Bunch's traumatic childhood, including the facts that Bunch's father had been mostly absent from the home, had a drinking problem and had been abusive to Bunch's mother. Counsel worried that Bunch's father would downplay this history and that they would in effect end up impeaching their own witness. They made a defensible strategic decision not to put him on the stand.

▉ Bunch's mother was prepared for trial and ready to testify to Bunch's family and social histories, his lack of disciplinary problems in schools, his lack of a criminal record, and his efforts to reconcile with his wife. When she actually testified, however, counsel had to ask a number of leading questions in order to elicit the favorable information. Her emotional affect was blunted as well, also diminishing her effectiveness as a witness.

Bunch now makes much of the outcome that only one witness, who was disappointing, testified in his behalf. Yet when counsel was preparing for the sentencing phase and asked both Bunch and his parents for names of potential witnesses with information that they could not provide, they did not suggest any. While counsel was aware of other family members, they believed that such testimony would only be cumulative with that of Bunch's mother. One of those whom Bunch now argues that counsel should have contacted is his ex-wife. Before the trial, however, Bunch instructed his counsel not to contact his ex-wife or to involve her in the case. It is difficult for us to fault counsel for failing to obtain additional testimony when the client himself was not forthcoming with names. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066; *Tucker v. Kemp,* 776 F.2d 1487, 1490 (11th Cir.1985).

Under these circumstances we conclude that Bunch's counsel made reasonable professional judgments and did not render constitutionally defective assistance of counsel. Counsel "did interview all potential witnesses who had been called to [their] attention and [ ] there was a reasonable basis for [their] strategic decision[s]." *Burger v. Kemp,* 483 U.S. 776, 794–95, 107 S.Ct. 3114, 3125–26, 97 L.Ed.2d 638 (1987). Bunch has simply not shown that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066.

### B.

■ Bunch raises additional claims that his right to effective assistance of counsel was violated. He contends that at the guilt phase of trial his rights were violated by his attorneys' failures: (i) to conduct adequate *voir dire;* (ii) to object to the Commonwealth's opening statement; (iii) to deliver an effective opening statement; (iv) to object to irrelevant inadmissible testimony; (v) to object to improper crossexamination of Bunch; (vi) to preserve for review the adequacy of the Indiana search warrant;

(vii) to object to admission of the gun. He also alleges other instances of ineffective assistance at the sentencing phase.

We affirm the district court's judgment that these additional claims are procedurally barred. The only claim of ineffective assistance of counsel that Bunch presented to the Virginia Supreme Court for collateral review concerned counsels' duty to investigate and present mitigating evidence at the sentencing phase. These other claims are therefore barred under *Whitley v. Bair,* 802 F.2d 1487, 1500 (4th Cir.1986), and *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

### IV.

Bunch asserts other points of error which occurred during the guilt phase of the trial. We shall address each in turn.

### A.

Bunch protests the introduction into evidence of two photographs of Thomas: one showing her hanging from the doorknob as she was found, and one black and white photograph of Thomas on the autopsy table. He argues that these photographs were inflammatory and that his conviction and sentence cannot have been the result of a reasoned and rational determination. *See Gregg v. Georgia,* 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976).

■ Bunch did not challenge at either trial or on appeal the photograph of the crime scene. That claim is therefore precluded. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). With respect to the second print, admission of evidence rests in the sound discretion of the trial court. Absent extraordinary circumstances, such questions of admissibility are matters of state law. The court admitted the photo for identification purposes and Bunch has shown no extraordinary circumstances that would justify disturbing that ruling. *See United States v. MacDonald,* 688 F.2d 224, 227–28 (4th Cir. 1982). Admission of the photograph was not a violation of fundamental fairness. *See Moore v. Illinois,* 408 U.S. 786, 798–

800, 92 S.Ct. 2562, 2569–71, 33 L.Ed.2d 706 (1972).

### B.

 Bunch also maintains that the evidence at trial was insufficient to establish a murder during the commission of a robbery, which was the basis for his capital murder conviction. *See* Va.Code Ann. § 18.2–31(d) (1988). He argues that where the killing and the unlawful taking are two separate acts and there was no intent to steal at the time of the killing, there is no robbery. *See Branch v. Commonwealth,* 225 Va. 91, 300 S.E.2d 758, 760 (1983). Bunch asserts that he had no intent to rob Thomas prior to the murder and took her jewelry only in an attempt to disguise the crime.

The Virginia Supreme Court considered this argument on direct appeal and summarized the "overwhelming" evidence that Bunch killed Thomas during commission of a robbery. That evidence included Bunch's statements to friends before the murder that he needed money badly, that he should "go up there to Dale City and knock that bitch off … and get her rings and things," and Bunch's confession, wherein he said his plan had been "to go down and take her jewelry and kill her and leave the area." This is more than sufficient evidence that Bunch had the intent to rob Thomas when he killed her.

### C.

 Bunch also asserts that his Sixth Amendment right to crossexamine witnesses and his Fourteenth Amendment rights to due process and equal protection were violated when the trial court failed to provide funds for Bunch to hire a pathologist.

Bunch waived this claim at trial and did not present it on direct appeal or at any phase of state habeas. It is therefore barred. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *see also Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974) (failure to raise issue at trial and on direct appeal bars state habeas review).

### D.

 One of Bunch's friends testified that Bunch spoke with him two weeks before the murder about wanting to rob a Pizza Hut. Bunch argued at trial and on direct appeal that this evidence was too remote from the crime to be relevant as to his intent to rob Thomas. On state habeas, Bunch enhanced his argument against this testimony's admissibility by asserting that it was unduly prejudicial character evidence. He asserts that his preserved claim of irrelevancy was broad enough to incorporate the newer grounds of inadmissibility.

Bunch's objection at trial was framed solely in terms of irrelevancy, however, and not in terms of constitutional deprivations. The state habeas court considered Bunch's argument and granted the government's motion to dismiss the claim on the grounds of procedural default. This is an adequate and independent state ground for decision that forecloses consideration of the claim on federal habeas review. *Coleman v. Thompson,* —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Ylst v. Nunnemaker,* —— U.S. ——, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). We see no reason in any event to disturb the discretion of the state trial court on this evidentiary ruling.

### V.

Bunch also asserts numerous claims of errors made at the sentencing phase of his trial. We shall address these claims too in order.

### A.

 Under Virginia's capital sentencing scheme, a death sentence cannot be imposed unless a jury determines beyond a reasonable doubt that the defendant represents a future danger to society or that the defendant's conduct was particularly vile. Va.Code Ann. §§ 19.2–264.2, –264.4(C) (1990). The trial court submitted to the jury only the question of vileness. A jury can impose a sentence of death for vileness only if the defendant's conduct satisfied

one of three statutory predicates: "torture, depravity of mind or aggravated battery to the victim." Va.Code Ann. § 19.2–264.4(C) (1990). Bunch argues that the trial court's instructions regarding the death penalty were constitutionally infirm for two reasons. First, he asserts that the court should have instructed the jurors that they must be in unanimous agreement as to which of the three vileness predicates existed. *See Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055 (1948). Second, Bunch asserts that the vileness predicate is unconstitutionally vague and that the trial court erred in failing to provide a limiting instruction.

We find no error in the instructions given by the trial court. With respect to the unanimity claim, we observe that the Virginia legislature has identified three different types of conduct, any of which would satisfy a finding of vileness. Virginia does not require that the jury identify the particular predicate on which it relies. *Clark v. Commonwealth*, 220 Va. 201, 257 S.E.2d 784, 791–92 (1979). The jurors, when polled, indicated that the finding of vileness was unanimous. That affirmance effectively "moots any claim of error in the instructions on unanimity." *Briley v. Bass*, 742 F.2d 155, 166 (4th Cir.1984); *see also Schad v. Arizona*, — U.S. —, 111 S.Ct. 2491, 2496–2500, 115 L.Ed.2d 555 (1991) (unless statutory alternatives were actually separate crimes, jurors' verdict was unanimous). This court has already considered the argument that the Virginia vileness statute is unconstitutionally vague and has rejected it. *See Clozza v. Murray*, 913 F.2d 1092, 1105 (4th Cir.1990).

### B.

■ Bunch alleges that the trial court erred in failing to strike for cause two jurors who were biased in favor of the death penalty, thus yielding "a jury uncommonly willing to condemn a man to die." *Witherspoon v. Illinois*, 391 U.S. 510, 521, 88 S.Ct. 1770, 1776, 20 L.Ed.2d 776 (1968). Although Bunch did not raise this claim either at trial or on direct appeal and it is procedurally barred, *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), Bunch asserts that the alleged error was such a fundamental miscarriage of justice that review is still available. *See Sykes*, 433 U.S. at 91, 97 S.Ct. at 2508.

■ The record, however, reveals that neither veniremember was biased. Although both potential jurors had initially agreed with the statement that the death penalty should be imposed in every case of murder regardless of the facts and circumstances, both changed their positions upon immediate requestioning. Failure to strike the potential jurors for cause did not lead to a fundamental miscarriage of justice where, as here, they stated their ability to consider fairly and impartially sentences besides death.

### C.

■ The Commonwealth introduced evidence at the sentencing phase that Bunch associated with prostitutes and had thoughts about killing people and becoming a mercenary hit man. Bunch asserts that this evidence relates only to future dangerousness and not to vileness and should have been excluded from the sentencing phase.

This objection was not raised at trial and the state habeas court found the claim procedurally barred under Virginia's contemporaneous objection rule. Our review of the claim is therefore also barred. *Coleman v. Thompson*, — U.S. —, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Ylst v. Nunnemaker*, — U.S. —, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

### D.

■ Bunch finally requests that we declare the Virginia death penalty statute and sentencing procedures to be facially unconstitutional. As the district court observed, the Supreme Court has upheld statutes similar to Virginia's both as to future dangerousness, *see Jurek v. Texas*, 428 U.S. 262, 269, 274–76, 96 S.Ct. 2950, 2957–58, 49 L.Ed.2d 929 (1976), and as to vileness. *See Gregg v. Georgia*, 428 U.S. 153, 201 & n. 51, 96 S.Ct. 2909, 2938 & n. 51, 49 L.Ed.2d

859 (1976). Bunch's claim is also conclusory in nature and disregards the multitude of challenges to the application of Virginia's capital punishment scheme which have been rejected.

## VI.

For the foregoing reasons, we hold Bunch's claims to be without merit. The judgment of the district court is hereby *AFFIRMED*.

SPROUSE, Circuit Judge, dissenting:

I concur in all of the majority opinion except Part II.A. to which I respectfully dissent.

The majority believes that the language used by the Supreme Court in *Edwards* was confusing and that the *Edwards* rule was neither bright nor linear. It is the majority's view that not until *Solem* was *Edwards* clarified as establishing "a bright-line rule that before a suspect can waive his invoked right to counsel he must be the party to initiate subsequent communication."

In my view, the bright-line rule was clearly announced in *Edwards*. *Solem* did not alter or modify the *Edwards* rule. Since the parameters of the waiver of counsel requirements were established in *Edwards*, consideration of *Teague's* retroactivity principles is simply misplaced. Accordingly, the Virginia courts should have observed *Edwards* and suppressed Bunch's statement to Cahill. Although the *Edwards* majority was challenged within the Supreme Court by two separate opinions, the majority rejected those challenges and, as shown in *Bradshaw*, and *Solem*, persisted in its view that once a defendant invokes his right to counsel, the accused must initiate conversation to establish a valid waiver.

The Supreme Court in *Edwards*, realizing that additional safeguards were necessary to protect an accused's request for counsel, held that:

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only

that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*

*Id.* 451 U.S. at 484–85, 101 S.Ct. at 1884–85 (emphasis added). The six-justice majority could not have been any clearer in its holding that once a suspect invokes his right to counsel, only communication initiated by the accused can provide the basis for further interrogation.

Chief Justice Burger concurred only in the judgment because he disagreed with the majority about the need for a "special" rule concerning the waiver of a right to be free from interrogation—opining that the validity of such waivers should be determined under the particular facts and circumstances standard of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Justice Powell also refused to join the majority. Like Justice Burger, he was of the view that the issue of Edwards' waiver of counsel should have been considered under the *Zerbst* standard. Justice Powell also criticized "what appears to be an undue, and undefined, emphasis on a single element: 'initiation.'" *Id.* 451 U.S. at 491–92, 101 S.Ct. at 1888.

The majority here claims *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), decided six days after Bunch's state appeal, demonstrates that *Edwards* was an uncertain rule. In *Bradshaw*, however, eight members of the Supreme Court restated that the waiver ruling in *Edwards* was absolute. The plurality opinion stated:

> We think the Oregon Court of Appeals misapprehended the test laid down in Edwards. We did not there hold that the "initiation" of a conversation by a defendant such as respondent would amount to a waiver of a previously invoked right

to counsel; we held that after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police."

*Id.* 462 U.S. at 1044, 103 S.Ct. at 2834 (citations omitted). Four dissenting justices agreed. The dissent stated, "To establish a waiver, it would thus be a necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.* at 1053, 103 S.Ct. at 2839 (internal quotations, emphasis, and citations omitted). Although the justices disagreed as to whether the defendant had in fact initiated conversation, both the plurality and the dissent agreed the defendant must be the one to initiate conversation for a valid fifth amendment waiver.

The issue in *Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), was whether *Edwards* established a "new rule" so as to apply retroactively to a state court decision rendered before *Edwards.* Justice White, for a five-member majority, wrote:

> *Edwards* established a bright-line rule to safeguard preexisting rights, not a new substantive requirement ... *Edwards* established a new test for when that waiver would be acceptable once the suspect had invoked his right to counsel: the suspect had to initiate subsequent communication....
>
> Before *Edwards,* the question whether the authorities could resume questioning after a defendant has asked for an attorney was acknowledged to be unsettled.

*Solem,* 465 U.S. at 646, 648, 104 S.Ct. at 1343, 1344. The *Solem* court held that since *Edwards* established a "new rule," it was not to be retroactively applied. Retroactivity, not the parameters of *Edwards,* was the issue in *Solem.* In fact, whether the treatment of defendant Stumes violated *Edwards* was not even an issue for decision. "We ... assume for present purposes that the conduct at issue here violated *Edwards.*" *Id.* 465 U.S. at 642, 104 S.Ct. at 1341. Therefore, *Solem* could not

have established a new rule because it neither extended nor modified *Edwards.*

The majority here holds that the Virginia Supreme Court could have reasonably interpreted *Edwards* to sanction the type of reinterrogation conducted by Officer Cahill, because not until *Solem* was it clear that the interrogation violated the rule established in *Edwards.* Because *Solem* announced a new rule, the majority reasons, it is not to be applied retroactively to Bunch. I disagree.

In *Teague,* Justice O'Connor defined a "new rule:"

> [A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.... To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Teague* 489 U.S. at 301, 109 S.Ct. at 1070. It is true that the Supreme Court in considering the "new rule" principle of *Teague* stated: "The 'new rule' principle therefore validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler,* 494 U.S. 407, 414, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (March 5, 1990). Not even in the most generous recognition of comity, however, could we suggest that a state court's interpretation of a United States Supreme Court decision on federal constitutional law is reasonable when the United States Supreme Court has clearly reached a contrary conclusion.

The majority here relies on the opinion of various state courts to illustrate that other state courts' interpretation of *Edwards* was similar to that of the Virginia Supreme Court in this case. The problem I have with that approach is that a majority of the United States Supreme Court justices have expressed views inconsistent with those expressed by these state appellate bodies. Although the majority here may take some comfort from the concurrence of Justice Powell in *Edwards* that he found the majority opinion confusing, it goes without

saying that if the majority of the Supreme Court holds the *Edwards* opinion to be clear—it is clear.

In collateral review cases, the Supreme Court, of course, is always sensitive to the effect of its opinions on the administration of criminal justice in state courts. *Teague* 489 U.S. at 308, 109 S.Ct. at 1073. Whether or not this comity concern is really another aspect of the sometime tension between concerns of finality on the one hand and fundamental fairness and protection of truth-finding procedures on the other, state court decisions cannot undermine the finality of decisions of the United States Supreme Court, under any of the various formulations for determining issues of retroactivity. *See Teague; Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *Mackey v. United States,* 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971); *Desist v. United States,* 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Palko v. State of Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). The majority opinion here, however, would interpret *Teague* as allowing lower courts to render a clear decision of the Supreme Court unclear; the result produces the very lack of finality the majority panel here decries.

So no matter how respectable state judicial authorities might be, we are concerned here with a federal constitutional issue. Although some state courts have reacted to *Edwards* as if its intentions were unclear and the announced test confusing, a majority of the Supreme Court has consistently treated it as announcing a bright-line test. The test in *Solem* is no different than in *Edwards.* Its results were dictated by the existing precedent of *Edwards.* *Edwards* clearly held that once a suspect invokes the right to counsel, police interrogation must not be renewed unless the suspect initiates the conversation.

Here Detective Cahill asked Bunch "if he felt he was ready to sit down and go over the case"—clearly Cahill, not Bunch, initi-

ated the conversation leading to the subsequent interrogation at the Prince William County police station. That was a violation of Bunch's fifth and fourteenth amendment rights defined by *Edwards.* In affirming the state trial court's denial of suppression, the Virginia Supreme Court committed constitutional error. Accordingly, I dissent on this issue.