966 F.2d 1442
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
John Sterling GARDNER, JR., Petitioner-Appellant,
v.
Gary DIXON, Warden, Central Prison, Raleigh, North Carolina,
Respondent-Appellee.
 No. 91-4010.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 4, 1992
Decided: June 4, 1992
As Amended on Denial of Rehearing
July 17, 1992.
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Winston-Salem. Frank W. Bullock, Jr., District Judge. (CA-88-179-WS)
 Argued: Robert Mauldin Elliot, Elliot, Pishko, Gelbin & Morgan, P.A., Winston-Salem, North Carolina, for Appellant.
 Barry Steven McNeill, Special Deputy Attorney General, North Carolina Department of Justice Raleigh, North Carolina, for Appellees.
 On Brief: Ellen R. Gelbin, Elliot, Pishko, Gelbin & Morgan, P.A., Winston-Salem, North Carolina; Marshall Dayan, North Carolina Resource Center, Raleigh, North Carolina, for Appellant.
 Lacy H. Thornburg, Attorney General of North Carolina, Joan H. Byers, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellees.
 M.D.N.C.
 AFFIRMED.
 Before RUSSELL, PHILLIPS, and HAMILTON, Circuit Judges.
 OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 In this habeas corpus proceeding, 28 U.S.C. § 2254, the petitioner John Gardner challenges the sentences of death imposed by the state of North Carolina following Gardner's murder convictions. The district court denied Gardner's petition for a writ of habeas corpus. On appeal, Gardner raises the following issues in support of his petition: (1) he was denied effective assistance of counsel at the sentencing phase of the trial because of counsel's failure to adequately investigate and present a case of mitigation; (2) he was denied due process of law by the State's failure to produce discovery and by prosecutorial misconduct; (3) the sentencing instructions were unconstitutional because they required unanimity in considering mitigating evidence; and, (4) he was denied due process of law when he was denied courtappointed psychiatric assistance. Gardner's challenges are directed at the imposition of the death penalty, as opposed to some lesser penalty. Gardner does not challenge the underlying convictions for murder before this court. We hold that the death sentences were not unconstitutionally imposed, and therefore affirm.
 
 
 2
 * A detailed recitation of the facts surrounding the murders which Gardner committed and the procedural history of his trial may be found in the opinion of the North Carolina Supreme Court on direct appeal from conviction. State v. Gardner, 319 S.E.2d 591, 594-96 (N.C. 1984), cert. denied, 469 U.S. 1230 (1985). We briefly summarize the factual background and subsequent proceedings.
 
 
 3
 On December 23, 1982, at approximately 12:30 a.m., two employees of a Steak and Ale restaurant in Winston-Salem, North Carolina, were closing the restaurant for the evening. Gardner entered the Steak & Ale at that time, demanded money, which was readily given to him by the employees, and killed the two employees with shotgun blasts to the face and neck. Linda Cain, a cashier at the restaurant next door to the Steak and Ale was walking to her car at the time of the robbery and murders. She heard the shotgun blasts and saw a man run from the Steak and Ale to the passenger side of a waiting automobile. She had direct eye contact with the individual for several seconds and later identified Gardner from police photographic line-ups as the fleeing individual.
 
 
 4
 On March 17, 1983, Jeff Royal, an inmate at the Forsyth County jail, implicated Gardner in the murders. When confronted that day concerning his involvement, Gardner denied participating in the murders, but stated that a prisoner he identified as"Johnny" had confessed to the killings. After repeating the "Johnny" story and failing a polygraph test approximately one week later, Gardner chose to make a statement, executed a waiver of rights, and stated that he was at the Steak and Ale, but had remained in the car while Jeff Royal and "Johnny" had gone inside to rob the restaurant. After he was taken to the crime scene and asked to recount events, one officer expressed disbelief of Gardner's story and Gardner confessed to committing the murders. He gave a second tape-recorded statement admitting that he was the triggerman in the killings and setting forth details of the incident.
 
 
 5
 The next day, March 24, the police asked Gardner to clarify certain statements in the tape-recorded confession. He further described the victims, where he had shot them, and their positions after they were shot.
 
 
 6
 Gardner was tried on two counts of first degree murder beginning September 19, 1983. He was convicted by the jury on both counts based on the felony murder rule (the murder was committed during a robbery with a dangerous weapon). At the guilt phase of the trial, Gardner presented an alibi defense and testified in his own behalf. Gardner recanted his confession and denied any connection to the robbery or the murders. He claimed he confessed merely to protect his girlfriend and that he knew the details of the crime from suggestions made by the police and secretly viewing photos of the crime scene while in custody.
 
 
 7
 At the sentencing phase of the trial, conducted before the same jury which rendered the guilty verdict, the jury recommended death sentences on each murder count. The State proffered no testimony at this phase of the trial, but relied on the testimony presented at the guilt phase. Gardner offered the testimony of a state psychiatrist who had evaluated Gardner for competency.
 
 
 8
 Judgments on Gardner's convictions and sentences were entered September 23, 1983. The judgments were affirmed on appeal to the North Carolina Supreme Court on August 28, 1984. The United States Supreme Court denied certiorari on February 19, 1985.
 
 
 9
 Gardner filed a motion commencing state habeas proceedings on December 2, 1985, alleging numerous grounds for overturning the convictions or sentences. An evidentiary hearing was held. Gardner presented evidence attempting to show that his trial counsel, Bruce Fraser, spent inadequate time preparing for the trial and that there was significant information about Gardner's childhood in state social services files and from testimony of his parents, relatives, friends and a psychological expert, that Fraser failed to discover and utilize as mitigating evidence at sentencing, thereby prejudicing Gardner's defense. Gardner also presented a defense attorney with experience in trying capital murder cases who opined that Fraser's performance was ineffective and prejudiced the trial.
 
 
 10
 The state habeas court rejected each of Gardner's claims by written opinion. This order was upheld on appeal to the state and federal supreme courts. Gardner v. State, Nos. 83 CRS 14519, 83 CRS 14520 (Forsyth Cty. Super. Ct. filed August 29, 1986), cert. denied, 361 S.E.2d 598 (N.C.), cert. denied, 486 U.S. 1061 (1987), reh'g denied, 487 U.S. 1246 (1988).
 
 
 11
 The present petition was filed in federal court on March 7, 1988, and referred to a magistrate judge for resolution of non-dispositive motions and a report and recommendation. 28 U.S.C.s 636. In an eighty-nine page order and report filed June 25, 1991, the magistrate judge denied Gardner's motions for discovery, a scheduling order, and an evidentiary hearing. The magistrate judge found that Gardner had presented a mixed petition, but that the State had unconditionally waived all further exhaustion of state remedies. Turning to the substance of the petition, the report recommended that each of Gardner's claims be denied. After the filing of objections by Gardner, the report and recommendation was adopted by the district court without elaboration on September 11, 1991. After denial of reconsideration, this appeal followed. The appeal was expedited and Gardner's execution, originally scheduled for January 10, 1992, was stayed pending appeal by order filed December 5, 1991.
 
 II
 
 12
 On appeal, Gardner's chief contention concerns the performance of his trial counsel, Bruce Fraser. Gardner claims he was denied effective assistance of counsel because Fraser failed to adequately investigate potential sources of mitigation in anticipation of the sentencing phase of the trial and subsequently failed to present "dramatic" mitigating evidence that was readily available and might have persuaded the jury to grant life sentences as opposed to sentences of death. Gardner does not challenge the underlying murder convictions.
 
 
 13
 The test for reviewing claims of ineffective assistance of counsel is well established. First, petitioner must demonstrate counsel's performance fell below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 668, 687-91 (1984). Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 
 
 14
 * Gardner's argument that Fraser's performance was deficient centers on Fraser's alleged failure to adequately investigate possible sources of mitigating evidence for the sentencing phase of the trial. At the evidentiary hearing conducted on state collateral review, Gardner presented the testimony of his father, his mother, an aunt who had cared for him as a child, his father's girlfriend who Gardner had referred to as "Mom," and a former girlfriend who had lived with Gardner for approximately five months. Gardner also presented records from county social services departments that had involvement with him and his family during his childhood. The records revealed an extremely difficult home life resulting from an abusive father and a drunken mother. Gardner's witnesses confirmed some of the tragic aspects of his childhood, but also stated that he could, nonetheless, be a loving and friendly individual.
 
 
 15
 Gardner also presented the testimony of a clinical psychologist who, in preparing for his testimony, reviewed the social service records and interviewed the petitioner, his family, and others. The psychologist opined that assuming petitioner's guilt, he was "under stress" at the time of the murders, was suffering from an emotional or mental disturbance, and his capacity to conform his conduct to the requirements of the law was impaired. The psychologist concluded that Gardner could be a decent human being, but when stressed, his abusive childhood would influence his behavior and impair his judgment.
 
 
 16
 Gardner argues that if Fraser had conducted a competent investigation, he would have discovered that these individuals were willing to testify as to his abusive childhood and his redeeming qualities. Gardner also contends that a reasonable investigation would have uncovered the social service records detailing Gardner's abused childhood. Gardner further concludes that discovery of this evidence would have better supported his motion for appointment of a psychologist for sentencing purposes, which was denied by the district court.
 
 
 17
 Gardner also complains that Fraser rarely visited him in the jail prior to trial. Fraser's time records presented at the hearing indicated only three specific conferences with plaintiff, but Fraser testified that there were other instances, not recorded in his time sheets, when he met with Gardner.
 
 
 18
 Finally, after filing his federal petition, Gardner submitted additional evidence, not addressed at the state level, that Fraser had been privately reprimanded by the state bar, and medical records from a detoxification center, dated September 18, 1989, which indicated that Fraser may have begun to develop drug and alcohol problems five to six years earlier, approximately the time of Gardner's trial. The magistrate judge made no findings and conducted no hearings with respect to this evidence.
 
 
 19
 The claim that Fraser spent too little time interviewing Gardner and preparing for the case is without merit. The state review court specifically found that Fraser spent 105 hours preparing for the trial of Gardner's case. This finding is presumptively correct. 28 U.S.C. § 2254(d); Sumner v. Mata, 449 U.S. 539, 550 (1981). While lack of effective communication between a prisoner and his counsel could support a claim for ineffective assistance, see Hutchins v. Garrison, 724 F.2d 1425, 1430 (4th Cir. 1983), cert. denied, 464 U.S. 1065 (1984), the brevity of contacts between counsel and defendant, standing alone, is not sufficient to support a claim of ineffective assistance. Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984). Fraser's representation was not objectively unreasonable for failure to meet more often with Gardner.
 
 
 20
 The second and chief ground for claiming that trial counsel's conduct fell below an objective standard of reasonableness concerns Fraser's alleged failure to conduct a proper investigation of petitioner's background in order to discover possible sources of mitigating evidence for the sentencing phase of the trial. As mentioned above, Gardner presented the testimony of several witnesses at his state postconviction hearing who related various aspects of Gardner's childhood, spoke of his good qualities, and represented that they would have been willing to testify on Gardner's behalf at trial if they had been asked. See Bassette v. Thompson, 915 F.2d 932 (4th Cir. 1990), cert. denied, 111 S.Ct. 1639 (1991) (proffer of potential witnesses preserves challenge to counsel's failure to call such witnesses). Gardner also presented county social service department records and the testimony of a psychologist which was based on an examination of the social service records and interviews with family members, friends, and petitioner.
 
 
 21
 An attorney has a duty to "conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed.... " Coles v. Peyton, 389 F.2d 224, 226 (4th Cir.), cert. denied, 393 U.S. 849 (1968). The reasonableness of a particular investigation is evaluated by the totality of the circumstances facing the attorney for the accused. Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991) (citing Strickland, 466 U.S. at 691).
 
 
 22
 Fraser was appointed to represent Gardner on July 7, 1983, and served as counsel through trial, which commenced on September 19, 1983.[1] Fraser had just over two months in which to prepare Gardner's case for trial. Despite an earlier confession, Gardner insisted on presenting an alibi defense at trial and gave Fraser the names of persons to contact to substantiate the alibi defense.
 
 
 23
 The testimony presented in the state post-conviction proceedings showed that Fraser investigated the alibi defense and, at the same time, attempted to explore possible mitigating evidence in his interviews with Gardner in preparation for the possibility that a guilty verdict would result. Fraser specifically sought to elicit from Gardner mitigating circumstances grounded in Gardner's past. The record conclusively establishes that Gardner never identified to Fraser any of the individuals who testified on his behalf at post-conviction proceedings as potentially helpful witnesses for trial. The only two individuals he did identify to Fraser were his mother and father, but Gardner emphatically stated to Fraser that he did not want his family involved in the defense of his case.
 
 
 24
 Gardner specifically related to Fraser the tragic circumstances of his childhood, particularly his father's abusive behavior, his mother's drunkenness, and his estrangement from both parents. Fraser specifically advised Gardner of the possible mitigating value of the father's abusive behavior during Gardner's childhood, but Gardner persisted in rejecting any attempt to involve his father or mother in the court proceedings and rejected Fraser's suggestion that a reconciliation with his father might prove helpful. Fraser attempted to inquire of Gardner about his being sexually abused while previously imprisoned, but Gardner categorically denied any such event ever occurred.
 
 
 25
 This court recently noted that where a prisoner forbids counsel to approach certain witnesses, is not forthcoming with names of helpful witnesses, or indicates that potential witnesses cannot contribute anything of value to the defense, "[i]t is difficult for us to fault counsel for failing to obtain additional testimony.... " Bunch, 949 F.2d at 1365. While a client's demand to not pursue certain avenues of investigation does not relieve counsel of all duty to investigate, it does limit the scope of that investigation." Gray v. Lucas, 677 F.2d 1086, 1093-94 (5th Cir. 1982), cert. denied, 461 U.S. 910 (1983). Cf. Whitley v. Bair, 802 F.2d 1487, 1494 n.15 (4th Cir. 1986), cert. denied, 480 U.S. 951 (1987) (failure to contact potential witness not unreasonable where defendant indicates contact would be fruitless because sister "hated his guts").
 
 
 26
 Gardner fully apprised Fraser of his father's abusive actions during his childhood and his continuing estrangement from his father and mother. Gardner insisted that these family members not be contacted and utilized in the defense of his case. Gardner further indicated that no useful information could be acquired through such contacts. In his one contact with a family member, an uncle, Fraser found the uncle "incoherent," which reinforced the statement of Gardner that questioning family members would prove unproductive. Each of these events, given Gardner's insistence that there was no useful information to be gained from his family and Gardner's failure to be forthcoming with potential witnesses, would lead a reasonable lawyer to conclude that investigative time would be better spent on other avenues. Where, as here, "defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland, 466 U.S. at 691. As to the presentation of additional character witnesses from among family and friends, we conclude, therefore, that under the circumstances, Fraser acted competently.
 
 
 27
 Gardner argues that Fraser, if he had acted competently, should have ignored Gardner's directives. Gardner contends that Fraser had a duty to seek out witnesses like those produced at the post-conviction hearing because Gardner was acting irrationally when he forbad Fraser from involving his family in his defense and was not forthcoming with helpful witnesses. This position is without merit. While Gardner, as Fraser characterized it, might have been acting like a "big man" and not "exercising the best of judgment" when he rejected Fraser's request for more names from family and friends and rejected Fraser's suggestion that he reconcile with his father, there is no evidence to support a finding that Gardner was "irrational" and incapable of making a reasoned judgment concerning the defense of his case. Cf. Blanco v. Singletary, 943 F.2d 1477, 1502 (11th Cir. 1991) (defendant "noticeably morose and irrational" when approached about mitigation witnesses and stated a preference that no mitigation be presented), petition for cert. filed, 60 U.S.L.W. 3655 (U.S. February 28 and April 1, 1992) (Nos. 91-1417 and 91-7841); Thompson v. Wainwright, 787 F.2d 1447 (11th Cir. 1986), cert. denied, 481 U.S. 1042 (1987) (defendant "experiencing mental difficulties").
 
 
 28
 In addition to the failure to call the witnesses proffered at the state habeas proceeding, Gardner also faults Fraser for failing to discover the social services department records pertaining to Gardner's tumultuous childhood. Such records are the proper subject of investigation in preparing a case in mitigation. See Thompson, 787 F.2d at 1451 ("childhood and early family life, school records" should be investigated).
 
 
 29
 As we previously noted, Gardner was not particularly forthcoming with respect to sources of mitigating evidence from his childhood. Gardner's admonition not to involve family members would not preclude investigation of the social service records. Nothing in the record, however, suggests that Fraser knew or should have known of the existence of these records. Although Gardner did reveal to Fraser his abused childhood, there is nothing in the record to indicate that Gardner provided information that would have led Fraser to conclude that such records existed, and, if so, in what county they could be located. Much child abuse goes wholly unreported and unrecorded. While Fraser was told that Gardner had been shuffled from home to home in his youth, Fraser had no specific recollection of Gardner stating that he had been placed in a foster home, a circumstance which might indicate that official records existed. By contrast, where Gardner was forthcoming regarding his past, Fraser obtained substantiating documentation such as Gardner's military records.
 
 
 30
 We do not hold today that counsel's duty to investigate is only as broad as the information provided by the defendant. We note, however, that a defendant's cooperativeness in the investigative process, which is part of the totality of the circumstances facing his attorney as he prepares defendant's case, helps determine the reasonableness of a particular course of conduct. It is difficult to fault the attorney for pursuing what his client refuses to reveal or indicates is not worthy of consideration. Under the circumstances facing Fraser in this case, we conclude that his investigation and utilization of mitigating evidence satisfies constitutional norms.[2]
 
 B
 
 31
 As noted above, though it presents a close question, we conclude that Fraser acted reasonably, under the circumstances, in his representation of Gardner. Even if we were inclined to find a deficiency in counsel's efforts, however, we would conclude that Gardner has failed to demonstrate prejudice under the second prong of Strickland.
 
 
 32
 In this case, the question presented under the second prong of Strickland is whether or not there is a reasonable probability that the jury would have recommended some punishment other than death but for the alleged errors of trial counsel. At the sentencing phase of the trial, the state put on no additional evidence, but relied solely on the evidence presented at the guilt phase of the trial. Fraser put on Dr. Rood, the state psychiatrist who had evaluated Gardner for competency approximately four months prior to his trial. Without going into great detail, Dr. Rood related the substance of her conversations with Gardner and her evaluation of his mental condition. She stated that Gardner had told her the following: (1) he had moved frequently as a child; (2) his mother was "a wine-o"; (3) he had failed several grades in school and had never completed high school; (4) he "hope[d] he [the father] died"; (5) he had abused drugs since he was a teenager; and (6) he had married at 18, but the marriage had failed despite counselling. Once again, without elaboration, Dr. Rood opined that Gardner was not suffering from any mental defect, but that his past history of substance abuse could have impaired his judgment at the time of the murders.
 
 
 33
 Using the testimony of Dr. Rood at the sentencing phase and the testimony of Gardner and one of his ex-girlfriends given during the guilt phase of trial, Fraser's closing argument at sentencing sought mercy for Gardner on the premise that Gardner had grown up without a support group, had no chance to receive proper training or develop normally and morally, and, therefore, had diminished responsibility for his actions that did not warrant imposition of the death penalty. Fraser made specific reference to Gardner's disadvantaged background, the alcoholism of his mother, and the lack of family support as mitigating factors on Gardner's behalf. Fraser specifically compared the culpability of Gardner, who had an impoverished background, with others who had opportunities to succeed, but threw them away and were, therefore, more culpable.
 
 
 34
 Consonant with Fraser's argument, the verdict form, completed by the jury after three hours of deliberation, specifically found as mitigating circumstances Gardner's family history, his history of alcohol abuse, and drug addiction as brought out by the testimony of Dr. Rood at sentencing. The jury did not find that Gardner was impaired in his ability to appreciate the criminality of his conduct and to conform his conduct to the law despite Dr. Rood's stated opinion that Gardner's past substance abuse could have caused such impairment.
 
 
 35
 The thrust of Gardner's argument on prejudice is that had Fraser not neglected his duty to investigate, he could have discovered and presented at sentencing the testimony offered by Gardner at the state post-conviction proceedings. This "dramatic" presentation of Gardner's childhood woes, Gardner contends, would have persuaded the jury to give life sentences, rather than death sentences, because of the difference in quality, depth, and mitigating value between Gardner's post-conviction evidence and the evidence Fraser actually presented and argued at trial.
 
 
 36
 Fraser clearly presented mitigating evidence to the jury and the jury specifically found Gardner's family life and drug and alcohol abuse to be mitigating factors. This case is thus distinguishable from the cases heavily relied on by Gardner finding ineffective assistance of counsel where counsel presented absolutely no mitigating evidence to the jury. See Kenley v. Armontrout, 937 F.2d 1298, 1300 (8th Cir.), cert. denied sub. nom., Delo v. Kenley, 112 S.Ct. 431 (1991) ("counsel submitted no mitigating evidence ... [and] made no closing argument"); Horton v. Zant, 941 F.2d 1449, 1461 (11th Cir. 1991), cert. denied, 112 S.Ct. 1516 (1992) (counsel conducted no investigation of mitigation and introduced no mitigating evidence); Blanco v. Singletary, 943 F.2d at 1500-02 (no mitigating evidence presented).
 
 
 37
 The evidence presented by Gardner at the state post-conviction proceeding was different in its depth and detail, but not in kind. It presented in greater "color" the disadvantages suffered by Gardner as a child. We are convinced however, that presentation of this additional evidence would not have swayed the outcome in this case. The murders in this case were senseless and brutal. The victims had fully complied with Gardner's robbery demands and were in the process of turning over the money demanded by Gardner when he shotgunned both victims in the head. The jury in this case was informed of Gardner's childhood and substance abuse problems, concluded they were mitigating circumstances, but found this mitigation was outweighed beyond a reasonable doubt by the aggravated nature of the brutal murders. We cannot say this decision would have changed had more "dramatic" evidence of childhood trauma been presented. Consequently, there was no prejudice and the claim of ineffective assistance of counsel is without merit.[3]
 
 III
 
 38
 Gardner also alleges he was denied due process of law because of the state's failure to produce certain discovery prior to trial and because of alleged prosecutorial misconduct. Each allegation is addressed in turn.
 
 
 39
 * Gardner contends that the prosecutor, prior to trial, failed to provide defense counsel with a copy of the statement of Jeff Royal implicating defendant in the murders. Gardner also contends that the state failed to produce information on benefits, promises and payments made to Royal in exchange for his testimony.
 
 
 40
 First, the statement by Royal with respect to Gardner was inculpatory with respect to Gardner, not exculpatory, therefore it was not subject to constitutional requirements of disclosure under Brady v. Maryland, 373 U.S. 83 (1963). Gardner alleges that the failure to produce the statement violated state discovery rules. Federal habeas relief is not concerned with violation of state discovery rules, however. Estelle v. McGuire, 112 S.Ct. 475, 480 (1991). There was also, as the magistrate judge concluded, no prejudice resulting from the alleged non-disclosure. Defense counsel was advised of the substance of Royal's statement prior to trial and Fraser effectively cross-examined Royal with respect to the statement and the basis for his knowledge.
 
 
 41
 Second, Gardner complains that the state failed to disclose inducements made to Royal to obtain his cooperation. Disclosure of such information, which could be used to impeach, is covered by the Brady rule. United States v. Bagley, 473 U.S. 667, 678 (1985). There is, however, on the record before the court, no evidence that the prosecutor made undisclosed promises or gave inducements to Royal and hence he had no such information to disclose. Crime-stoppers, an organization independent of the city of Winston-Salem, had in fact offered Royal $600.00 for the information. This fact, and the fact that Royal anticipated the possibility of receiving additional reward money from another non-governmental reward source, were fully revealed during Royal's testimony. The jury, therefore, had a full opportunity to weigh such information in evaluating Royal's testimony and his credibility. Thus, even if the prosecutor had a duty to disclose information about these awards, no prejudice is apparent in the record.
 
 
 42
 At the time he filed objections to the magistrate judge's report, Gardner also submitted various documents purporting to be new evidence implicating Royal in the murder. These documents included yearbook pictures which defendant claims show that Royal knew one of the victims and an affidavit from a friend of the victim stating that the victim was very trusting and might have let someone she knew into the restaurant. Also included were affidavits from an investigator and one of Gardner's present attorneys in which they allege they were told by a Randy Church that Jeff Royal had told Church, while they were in jail together in 1984, that he [Royal] was present on the night of the Steak & Ale murders.
 
 
 43
 None of the evidence offered concerning Royal is exculpatory with respect to Gardner. There is no evidence that the state was aware of the proffered statements implicating Royal in the murders prior to trial so that disclosure of such statements under Brady was required. On their face, the affidavits do not clearly set forth the time period when Church allegedly spoke with Royal, whether before or after Gardner's trial. In either case, Church allegedly stated that he never told law enforcement authorities about Royal's alleged confession becuase he had nothing to gain by making a statement. Petitioner's assertion that the state "must have known" of Royal's alleged statements is unsupported by the record.
 
 B
 
 44
 Gardner also contends that the prosecutor improperly questioned him about prior Miranda warnings and whether he had committed another murder in a neighboring county. Prosecutorial misconduct claims are reviewed to establish if an improper action by the prosecutor "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 180 (1986).
 
 
 45
 Gardner took the stand in his own defense and was subject to impeachment like any other witness. At trial, Gardner sought to disavow his confession to the crimes. As the magistrate judge correctly noted, the prosecutor's question about Miranda warnings went directly to the issue of the voluntariness of Gardner's confession by demonstrating that Gardner was familiar with his rights at the time of his confession. See Crane v. Kentucky, 476 U.S. 683, 688 (1986). Gardner's prior criminal record was the subject of cross examination, so any reference to prior Miranda warnings did not prejudice the defense.
 
 
 46
 The question concerning the murder in another county was also proper under the rules of evidence governing the trial. The prosecutor had a good faith basis for asking the question since Gardner was connected with that murder. When met with Gardner's denial of involvement, the prosecutor did not attempt to introduce extrinsic evidence on the issue, but accepted Gardner's answer. Gardner denied participation at trial, but in fact later pleaded guilty to that same murder. No due process problem arises from the circumstances surrounding this line of questioning.
 
 C
 
 47
 Gardner contends that the prosecutor's reference to"your kids ... my kids" in the closing argument at the sentencing phase of the trial constituted misconduct which improperly inflamed the jury and denied him due process. This claim is reviewed to see if "the disputed statement so infected the ... sentencing with unfairness that the ultimate conviction and sentence constituted a denial of due process." Gaskins v. McKellar, 916 F.2d 941, 951 (4th Cir. 1990), cert. denied, 111 S.Ct. 2277 (1991).
 
 
 48
 Gardner cites several cases specifically condemning this type of argument because it invites the jury to "depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." See e.g. United States v. Teslim, 869 F.2d 316, 328 (7th Cir. 1989). The government asserts that read in context, the remarks were not inflammatory and do not rise to the level of a constitutional violation.
 
 
 49
 The prosecutor's remarks were improper. The prosecutor, by his comments, specifically asked the jury to think of the victims as their own children after emphasizing the intrinsic worth of children. While the remarks do not call on the jury to ignore the law, they did invite the jury to inject personal considerations and emotion into the sentencing decision. Given the overall trial and the context in which they were made, however, the remarks do not rise to the level of a constitutional violation that would warrant a new sentencing hearing. See Teslim, 869 F.2d at 328.
 
 IV
 
 50
 Gardner attacks the jury instructions and verdict form used in this case on the ground that both prevented the jury from considering mitigating evidence unless all twelve jurors agreed on the existence of a particular mitigating circumstance. He claims that this violated the rules established in Mills v. Maryland, 486 U.S. 367, 384 (1988), and McKoy v. North Carolina, 494 U.S. 433 (1990). Passing the questions of the retroactivity of these rules and the possible waiver of the retroactivity question by the State, the rules do not in any event apply to the facts of this case.
 
 
 51
 Applying Mills, the Supreme Court in McKoy struck down North Carolina jury instructions that specifically required the jury unanimously to find mitigating circumstances before those circumstances could be weighed against aggravating circumstances in deciding whether to impose a sentence of death. In this case, neither the jury instructions nor the verdict form contains any such unanimity restriction on the jury's use of mitigating evidence.
 
 
 52
 Where, as here, no unanimity requirement is contained in the instructions or verdict form, petitioner's claim must fail. See Maynard v. Dixon, 943 F.2d 407, 419 (4th Cir. 1991), cert. denied, 112 S.Ct. 1211 (1992) (comparable instructions upheld against McKoy attack; retroactivity assumed with decision).
 
 V
 
 53
 Gardner finally claims that the trial court violated due process by denying him the assistance of a court-appointed psychiatric expert. In Ake v. Oklahoma, 470 U.S. 68 (1985), the Supreme Court held, "[w]hen a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue." Id. at 74. Such assistance is required at both the guilt and sentencing phases of capital trials.
 
 
 54
 This court has held that the holding in Ake is a new rule under Teague v. Lane, 489 U.S. 288 (1989), that is not applied retroactively on collateral review. Bassette v. Thompson, 915 F.2d at 938-39. Ake was decided after Gardner's conviction was final, therefore, it does not apply in this case.
 
 
 55
 Assuming the merits of the Ake claim are reached, however, there was no showing by defendant to the trial court that his sanity was at issue or that the state intended to put on psychiatric evidence at trial regarding Gardner's danger to society, the circumstances under which psychiatric assistance was deemed necessary in Ake.
 
 VI
 
 56
 In conclusion, the court holds that the sentences of death were not unconstitutionally imposed in Gardner's case. While, with the gift of hindsight, we may second-guess the decisions of petitioner's counsel, we cannot say that he acted unreasonably under the circumstances presented to him before and at the time of petitioner's trial. If counsel erred with respect to the preparation and presentation of Gardner's case at sentencing, we conclude that there is not a reasonable probability that the errors alleged by Gardner would have persuaded the jury to reach a different verdict. We further conclude that none of the other challenges raised by Gardner merit a new sentencing hearing. The order of the district court, denying the petition for a writ of habeas, is affirmed, and the stay of execution entered December 5, 1991, is vacated.
 
 AFFIRMED
 
 
 [1]
 The petition for a writ of habeas indicates that Gardner was initially represented by Mr. Michael Grace, appointed counsel of the North Carolina bar, from the time he was arrested in connection with these murders until arraignment
 At the time of Gardner's trial, North Carolina law did not require appointment of more than one attorney in capital cases. Subsequent to petitioner's trial and convictions, the law was amended to require appointment of assistant counsel in capital cases. N.C. Gen. Stat. § 7A-450 (1989).
 
 
 [2]
 Gardner presented evidence, for the first time in district court, as an attachment to the objections to the report of the magistrate judge, that Fraser was privately reprimanded by the North Carolina State Bar for neglect of duty to a client in 1983 at approximately the same time as Gardner's trial. There was also evidence of Fraser's admittance to a treatment center for alcohol and cocaine dependency in September 1989 and a temporary suspension from practice in June 1990 connected to neglect of client matters rising from the dependency problem treated in 1989. Gardner's habeas petition does not, however, allege that Fraser's performance at trial was impaired by drugs or alcohol and has never been amended to assert such a claim. By motion filed February 3, 1992, the eve of the hearing on this matter, petitioner sought to expand the record on appeal to include additional documents concerning Fraser's legal woes
 Petitioner has given no reason for waiting until the last minute to file the documents contained in the motion of February 3; therefore, the court denies the motion to expand the record as untimely. The most recent document attached to the motion is dated January 4, 1992, almost one month prior to its submission to this court.
 Even if the motion was granted, the court concludes that the information provides Gardner no grounds for relief. The documents attached to the objections to the report of the magistrate judge and to the motion to expand the record bear little relevance to Fraser's conduct at the time he represented Gardner. Gardner did not allege in his petition and there is no evidence in the record showing that Fraser was under the influence of alcohol or drugs at the time he was preparing or trying Gardner's case. A claim of ineffective assistance of counsel is judged by the "reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct." Strickland, 466 U.S. at 690. The subsequent legal and personal woes of Fraser set forth by plaintiff bear little, if any, relationship chronologically to petitioner's case.
 
 
 [3]
 In deciding the prejudice issue, the court also notes that since the original imposition of the death sentences in this case, Gardner pleaded guilty to another murder in Rowan County, which occurred only days before the murders in this case. See State v. Gardner, 320 S.E.2d 688 (N.C. 1984). Commission of this offense could be another aggravating factor before the jury in any resentencing of Gardner for the subject murders